**CITY OF STILLWATER, Oklahoma, a municipal corporation, Appellee,**

v.

**OKLAHOMA WATER RESOURCES BOARD, and Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, Appellants.**

No. 45266.

Court of Appeals of Oklahoma, Division 2.

June 18, 1974.

Released for publication by order of the Court of Appeals July 11, 1974.

W. Keith Thomas, Stillwater, for appellee.

Larry Derryberry, Atty. Gen., and Robert H. Mitchell, Asst. Atty. Gen., Oklahoma City, for appellant Oklahoma Water Resources Bd.

E. Moses Frye, Bd. Counsel, and Ray Lee Wall, Asst. Bd. Counsel, Stillwater, for appellant Bd. of Regents for the Oklahoma Agricultural and Mechanical Colleges.

BRIGHTMIRE, Presiding Judge.

Over the objection of appellee, City of Stillwater (City), the Oklahoma Water Resources Board (Board) handed down a final order determining that the Oklahoma State University Board of Regents (Regents) has an exclusive vested right to all water in Lake Carl Blackwell.

The order provoked City into filing a petition for judicial review challenging its validity in the District Court of Payne County. The challenger was successful, for on August 23, 1971, a hearing was held consisting only of "oral argument"—there being an absence of disputed fact—following which the trial judge entered a judgment reversing Board's order with regard to Lake Carl Blackwell water and ordered it "to release to the City of Stillwater surplus water contained in" the lake.[1]   Both

1. The trial court findings and conclusion contained on the "Journal Entry" read:

"Now on this 27th day of September, 1971, the Court being fully advised in the premises FINDS that in 1935 the United States Government took title to approxi-mately 35,000 acres of land in western Payne County for the purpose of resettling economically deprived farm people living in the area to more fertile and productive land and restoring the soil to its original fertility. Duties of Resettlement Adminis-

Board and Regents appeal insisting the adjudication is wrong.

Historically the present controversy reaches back to the late thirties. It was then that land now inundated by Lake Blackwell was acquired as part of the "Submarginal Land Program" begun in 1935 by the "Resettlement Administration." The land was later transferred to the United States Department of Agriculture. This agency acting through its Soil

Conservation Service, built Lake Carl Blackwell dam on Stillwater Creek located in Payne County near Stillwater, with federal funds authorized for university related educational and research programs. As stated initially the principal uses of the lake were to be for biological and cattle grazing research, for flood control, and for recreation.

On January 25, 1940, the Department of Agriculture filed application "No. 40–1"

tration were ultimately transferred to the Soil Conservation Service.

"On January 25, 1940, the Soil Conservation Service filed an application with Oklahoma Planning and Resources Board for permission to construct an earthen dam and impound waters of Stillwater Creek (Lake Carl Blackwell) located in Sections 10 and 15, Township 19 N., Range 1 E. of I.M., Payne County. In due time the dam was completed and title to the lake and surrounding area (land originally acquired by Resettlement Administration) was conveyed to the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges.

"On Feburary 28, 1940, the City of Stillwater filed an application with the Water Resources Board for an appropriation of surplus water from Lake Carl Blackwell, 'but action was deferred until such time as the College and the City could reach an agreement.' The City and the Board of Regents executed a contract on the 14th day of January, 1945, by the terms of which the Board agreed to issue its bonds and construct a large water line from the lake and erect a water treatment plant near the campus of the University; the City agreed to purchase treated water for the purpose of funding the bonds issued by the Board of Regents. In May, 1966, a supplemental contract was executed by the parties and additional bonds were issued by the Board for the purpose of doubling the capacity of the water treatment plant.

"All parties to the controversy have considered and referred to the waters in Lake Carl Blackwell as surface water and therefore privately owned by the Board of Regents. If this is the case, the decision by the Water Resources Board is probably correct. In order to properly classify the character of the water it will be necessary to determine whether Stillwater Creek is a definite stream or a shallow depression where surface waters collect in ponds and shallow lakes on privately owned land. The Board made no finding on this question,

but this will not be necessary. The Court takes judicial notice that Stillwater Creek is a definite stream, originating in Noble County, crossing Payne County in a southeasterly direction and emptying into the Cimarron River near Ripley. It reaches enormous proportions (nearly one-half mile wide) during floods. See Board of County Commissioners of Kay County vs Smith, 148 P. 111; 47 Oklahoma 184.

"Since Stillwater Creek is a definite stream it follows that the water impounded therein belongs to the public. The Board of Regents has a vested right to use the water for its own purposes such as irrigation, campus uses, and experimentation, but the surplus is public waters and should be released to the City of Stillwater for its beneficial use. Title 60, Section 60, and Oklahoma Resources Board vs. Central Oklahoma MC District, [Okl.], 464 P(2) 748.

"The rights of the parties are governed by Title 82, Section 91, as amended by the 1959 Legislature. This law is procedural in its application and in no way affects the substantial rights of the parties.

"The City of Stillwater and the Board of Regents have, by contract, determined that the City has the right to use surplus waters of the lake and certain rights have become vested in. such contract. This decision is not intended to impair the obligation of the contracts heretofore entered into by the parties, but shall be prospective in its operation and be a guide line for future negotiations.

"The Court is therefore of the opinion and finds that the final order made by the Water Resources Board December 12, 1967 in the matter of the determination of vested water rights, Cimarron River System 2–9, priority No. 40, shall be and the same is hereby reversed and the Water Resources Board ordered to release to the City of Stillwater surplus water contained in Lake Carl Blackwell. Exceptions allowed to the Board of Regents and Water Resources Board."

for construction of the dam in question pursuant to the provisions of a special statute relating to the "Appropriation of Water by United States"—an act which has been on the books since before statehood. It is designated as § 13081 in the 1931 Oklahoma Statutes and 82 O.S. § 91 in the 1941 and subsequent decennial codifications, though it has been amended since 1941. The law read thus through the thirties and forties:

"Appropriation of Water by United States.—Whenever the proper officers of the United States, authorized by law to construct works for the utilization of waters within the States, shall notify the State Engineer [1A] that the United States intends to utilize certain specified waters, the waters so described, and unappropriated at the date of such notice, shall not be subject to further appropriation under the laws of this State, for a period of three years from the date of said notice, at which time the proper officers of the United States shall file plans for the proposed works in the office of the State Engineer for his information, and no adverse claim to the use of the waters required in connection with such plans, initiated subsequent to the date of such notice, shall be recognized under the laws of the State, except as to such amount of the water described in such notice as may be formally released in writing by an officer of the United States, thereunto duly authorized; Provided, that in case of failure to file plans for the proposed work within three years, as herein required, the water specified in the notice given by the United States to the State Engineer shall become public water, subject to general appropriation."

On the same day the application was filed Don McBride, Chief Engineer for Board's predecessor,[2] dictated a letter to the federal department acknowledging receipt of the application and saying further:

"Inasmuch as this is an application by a Federal department, no further procedure is necessary because state law says that when a Federal department serves notice of their intention of use, the waters must be set aside, not subject to further appropriation."

Then over a month later, on February 28, 1940, City made application (No. 40–32) for the appropriation and use of about six hundred million gallons of Lake Carl Blackwell water a year. It has filed a couple more applications since but no action has ever been taken on any of them.

On January 31, 1947, the United States leased Lake Blackwell to Regents and later on December 13, 1954, deeded the lake to the university.

In the meantime City and the university had had between them a "Water Service Agreement" since 1942 under which the educational institution bought "potable water" from City. The source of the water was not Lake Blackwell, however, and the contract has long since been terminated.

The first agreement between City and Regents mentioned in this record regarding Lake Blackwell water was executed January 14, 1949. In it Regents agreed to furnish treated water not needed by the university to City at a fixed rate. This contract was superceded by a second one made on May 6, 1966, which is currently in force and runs to 1981. In it City agrees to pay one cent per thousand gallons of raw water it takes to help pay for maintenance and improvement of the dam and transmission facilities. City also must pay an additional two cents per thousand gallons for the raw water the university treats and furnishes it.

This was the situation when Board published and mailed notice of a hearing to be held December 12, 1967, on its proposed Final Order No. 30 determining vested

---

1A. Power and duties later transferred to Oklahoma Planning and Resources Board.

2. Oklahoma Planning and Resources Board.

surface water rights in regard to the Cimarron River Stream System 2–9, which included "Priority No. 40 . . . granting Vested Water Rights to the Oklahoma State University" in and to Lake Carl Blackwell waters.

On that day official Board minutes reveal Stillwater's City Attorney was present along with its City Manager "protesting the vested right in the Oklahoma State University (Priority No. 40)." The attorney "gave the Board a run-down on the history of the development and use of water from Lake Carl Blackwell," City's contract with OSU, "and appealed to the Board to recognize their viewpoint that the City of Stillwater had at least a 'co-equal water right with the University.' Some discussion followed, but it was the consensus that if the City of Stillwater had a right, it is a contractual one," and upon motion made and seconded Final Order No. 30 was "unanimously" approved.

City filed an application for rehearing and Board denied it January 9, 1968, resulting in commencement of this action.

In its Petition for Review, City complained of the procedure followed by Board in finalizing Final Order No. 30 saying that it was decided upon November 14, 1967, at a meeting held without notice to and in the absence of a City representative. Also hit was a failure of Board to "include any findings of fact upon any of the issues . . . as required by law." City said the order was "erroneous . . . contrary to law . . . and capricious." City prayed the court to review the order "insofar as the determination of vested surface water rights in and to the water diverted from Lake Carl Blackwell is concerned . . .", reverse and remand it to the "Board for further proceedings." Appellants for answer filed a general denial May 10, 1968.

The case thereafter lingered without any vigorous prosecution until shortly before the September 1971 adjudication. As can be seen in the earlier quoted portion of the court's journal entry, his conclusion rested essentially on this syllogism: (1) The waters in Lake Carl Blackwell are not surface waters (as all parties assume) because they are impounded by a dam across "Stillwater Creek . . . a definite stream"; (2) such water "belongs to the public"; (3) therefore Regents "has a vested right to use the water" they need therefrom, "but the surplus" belongs to City. The court cites 60 O.S.1971 § 60 [3] and Oklahoma Water Resources Bd. v. Central Okla. Master Conservancy Dist., Okl., 464 P.2d 748 (1969) as support for its reasoning.

On appeal City attempts to defend the trial court result on the sole ground that Board's final order was based on a misapplication of statutory law—mainly O.S.1931 § 13081—because (1) the United States of America never perfected an appropriation of Lake Blackwell water which it could transfer to Regents; and (2) the 1963 enactment of 82 O.S.1971 § 1–A has the effect of vesting a right to use Lake Blackwell waters in City.

Before discussing City's theory we should say a word or two about the trial court's approach to the problem. It seems fairly clear that for his major premise he sifted a couple of points from *Central Okla. Master Conservancy Dist.* (from now on referred to as "Central"), applied them out of their factual context to achieve a simplistic minor premise—that the lake belongs to the public—and then a defective conclusion: that City has a vested right to all water not used by OSU. There are two findings unstated in the trial court's journal entry which must be implied before any legal sense at all can be made of his rationale, namely, the two points mentioned above being argued by City. Thus to dispose of City's proposition is to dispose of the trial court's theory.

The first part of City's argument—that Regents have no appropriative right to

3. This statute essentially vests ownership of "surface water" in landowner and authorizes a riparian to store it on a "definite stream" by means of a dam on his land.

Lake Blackwell waters because their transferer, the federal government, never perfected any—goes like this: While the United States Government made proper application to withdraw Lake Blackwell water (then unappropriated) on January 25, 1940, under the provisions of 82 O.S.1941 § 91, its efforts never ripened into a perfected appropriation because it failed to perform three statutorily required conditions precedent: (1) make a hydrographic survey; (2) procure an adjudication of its water rights; or (3) file the dam plans, citing Gay v. Hicks, 33 Okl. 675, 124 P. 1077 (1912). Hence, concludes City, Regents received by transfer from the federal government only that which the latter possessed—nothing!

Then City says it "has complied with *all* the requirements imposed by 82 O.S.1961, paragraph 91" and has therefore perfected its three applications for appropriative rights submitted in 1940, 1955, and 1957—all, that is, except for an adjudication which, however, it says was eliminated as a condition precedent by "the enactment of the 1963 amendments," evidently referring to 82 O.S.1963 Supp. §§ 11 & 12, each of which sections contained a proviso saying that neither a survey nor an adjudication is to be deemed a "condition precedent to the granting of permits and licenses to appropriate water as authorized by . . . Title 82 . . ."—provisos which apparently destroy the ill effects of Gay v. Hicks, supra, holding the contrary as to private appropriators.

Perhaps the orderly approach to the problem is to first settle the question of whether or not Regents have a valid appropriative right to subject water—a point the parties agree is crucial.

As quoted earlier, a special statute existed in 1940—O.S.1931 § 13081—granting the federal government appropriative water rights to unappropriated water simply by filing notice of intent to utilize it. That was it. The water described in the notice was not subject to any other appropriation for three years during which time the United States was required "to file plans for the proposed work," else the water became open to general appropriation. It seems fairly obvious that the three-year proviso was intended to encourage diligence in regard to getting federal construction projects going and at least freeing water rights if project plans perished. Therefore actual construction of a dam must be regarded as substantial compliance with the requirement to file plans, even though, as in the instant case, no evidence is in the record that plans for the dam were actually filed with the State Engineer within three years after January 1940. The fact here is that the dam was in and impounding water in 1940.

Thus the Department of Agriculture did all the 1931 special statute (§ 13081) required of it in order to perfect its appropriative right to Lake Blackwell water. Contrary to City's contention the law did not make it incumbent upon the United States to make a hydrographic survey of the system involved. While such a survey is called for in Ch. 70, art. 2, O.S.1931 § 13060, the requirement is that "The state engineer shall make hydrographic surveys . . . and . . . He shall be authorized to co-operate with the agencies of the federal government engaged in similar surveys . . . and may accept and use . . ." the work product of the latter.

Nor was there a statutory imposition on the federal government to seek an adjudication of its rights. The adjudication referred to in O.S.1931 § 13061 relates to private claims and places the duty of litigating on the state Attorney General saying, "Upon the completion of such hydrographic survey of any stream system, the state engineer shall deliver a copy thereof together with copies of all data necessary for the determination of all rights to the use of the waters of such system, to the attorney general who shall within sixty days thereafter enter suit on behalf of the State for the determination of all rights to the use of such water, and shall diligently prosecute the same to a final adjudication . . . ."

It should be noted that §§ 13060 and 13061 are among a series relating to "private" water rights, claims and storage construction permits. The United States is dealt with separately—a classification that is reasonable based on its rather unique ability to plan and finance larger water related projects.

Furthermore as mentioned in *Central* (Supplemental Opinion at 464 P.2d 755, 756) even if the two things—survey and adjudication—had been conditions they were procedural in nature and thus retrospectively "eliminated by the 1963 amendments to the pertinent sections of Title 82."

■ Declining to consider the water impounded in Lake Blackwell as "surface water," the trial court below judicially noticed that Stillwater Creek was a "definite stream." With this notice we find no fault. Nor do we find anything amiss in characterizing the lake contents as "public" water, hence state owned. Both facts support a conclusion that the trapped waters were a proper subject of appropriation by the federal government in 1940 and once withdrawn the following legal principles became operative according to *Central*.

■ First, the nature and validity of a properly initiated appropriative water claim is governed by the law in force at the time—in this case O.S.1931 § 13081. A delayed perfection of the right relates back to the date of initiation—the critical fact in determining the priority and quantums of appropriative rights.

■ Here the facts are that on January 25, 1940, the Department of Agriculture notified Board of its intent to utilize the waters in question. By force of O.S.1931 § 13081 the waters of Lake Carl Blackwell were thereby withdrawn from any other

appropriation and by completing the dam within three years thereafter the United States perfected its claim retroactive to the notification date.

■ Later on Regents could and did succeed to the rights of the United States by transfer. According to *Central*, Regents acquired by the transfer "the priority of the initial appropriation"—and, as the Department of Agriculture's "privy," Regents must be regarded "as standing in the very same position as the state itself."

■ This would be a good place to discuss one feature of this case which may shield it even from the criticism some have directed toward *Central*.[4] The transfer in this case was to a state agency—in effect to the state itself. Consequently the only thing that happened here was that the state gave the water rights to the United States who in turn built a dam across a definite stream through which flowed state water and then gave the impounded water back to the state. Hence it would seem that even absent a valid appropriation by the federal government, the state as original owner still owns the water and will continue to do so until it transfers it to some other person or entity. By contrast City admittedly has never perfected any appropriation of the water. It can claim neither stored surface water ownership nor riparian rights in or to Lake Blackwell waters because it does not now own nor ever has owned any land in relevant proximity of the Stillwater Creek watershed so far as the record discloses. It has no "vested" user rights as it suggests 82 O.S.1963 Supp. § 1–A(b), par. 5 gives it because, among other things, there is no evidence City was a user of subject water at the time of the United States utilization notice January 25, 1940.[5] The most it can claim

4. Rarick, Oklahoma Water Law, Stream and Surface Under the 1963 Amendments, 23 Okla.L.Rev. 19 at 52 (1970).

5. Dr. Rarick in his article cited in footnote 4, gave an interesting historical explanation of § 1–A(b), par. 5 at page 43:
"The fifth subdivision could have been appropriately labeled the Lake Thunderbird

amendment. It was referred to within the Committee, in fact, as the Norman amendment. This happened because the Committee had Norman's and the other Thunderbird cities' situation in mind when this paragraph was included. The adjudication necessary to the validity of the Thunderbird appropriation had been dismissed. The Committee thought that the withdrawal of

at this point in time is the right to buy from Regents water in excess of OSU's needs at reasonable rates for storage and carriage as provided for in 82 O.S.1971 § 101—a right which has been recognized and honored by university overseers since the late forties.

City correctly notes that the instant case is distinguishable from *Central* because here a contract user is pitted against an appropriator while in *Central* it was appropriator (conservancy district) against riparian (City of Oklahoma City). And the issues are quite different. In *Central* an appropriator challenged a riparian's right to store its surface water on a definite stream—a right, Rarick says, the 1963 amendments were designed to create and thereby resolve the "conflict between riparian and appropriator [which] has had a potential since before statehood."[6] Naturally the author expresses explicit disappointment that the court in *Central* failed to recognize the legislative objective and sustain such a riparian right.

In the case at bar, however, City does not claim ownership of any Lake Blackwell water on the basis of it being surface water from riparian land it owns. Certainly it has no ownership in the dam and we are unable to think of any it has in the resulting lake.

In our opinion Board correctly found that City has no vested ownership in Lake Carl Blackwell water. Its only legal right is that of a contractual user of water not needed by OSU—a right granted by 82 O. S.1971 § 101. Nothing did it prove in the court below to support a conclusion that such finding was erroneous. Moreover in view of the undisputed facts and circumstances we can see no way Board could have legally reached any result other than the one it did. It appears to us any change of the lake's legal status will have to come about through legislative action— if it is to come at all.

We hold the trial court erred in reversing Board's final order of December 12, 1967. Therefore the judgment appealed from is reversed and Board's final order is reinstated and affirmed.

NEPTUNE, J., concurs.

BACON, J., concurs specially.

BACON, Judge (specially concurring).

I specially concur in the opinion of the majority. After extensive informal conference with all parties in attendance, it appears appellee's claim is based upon the United States Government's failure to effect a hydrographic survey and adjudication when it "appropriated" the waters in question. Appellee argues since the survey was not done, nor the adjudication obtained, the United States Government did not make a valid appropriation, and therefore appellant Regents could take nothing from the United States. Appellee relies upon *Gay v. Hicks,* 33 Okl. 675, 124 P. 1077 (1912), which held a hydrographic

---

water for Lake Thunderbird was highly doubtful. With this situation particularly in mind the withdrawal of water by the federal government under section 91 without a prior adjudication was made the basis for an appropriation. The date of priority assigned was the date of the notice of withdrawal.

"As has been indicated before, and as will be examined in some detail in a subsequent article in this series, many members of the Committee deeply resented the ability of the federal government to tie up water in Oklahoma by simply giving notice of intention to use. Under the section as it then stood, the federal government could tie up any quantity of unappropriated water for a period of three years simply by giving notice of intent to use the same. If within the three years, plans to use the same were filed, then apparently the water needed for the planned project would be tied up permanently, unless formally released by an officer of the United States authorized to do so.

"A group of the Committee took out their pique at the situation by the adoption of a provision vesting rights accruing as a result of such withdrawals in the users of the water rather than in the federal government. What was that old saying about whistling 'Dixie'?" (footnotes omitted)

6. 23 Okla.L.Rev. 19 at 67.

survey and adjudication were conditions precedent to acquiring a valid appropriation.

At the time Gay v. Hicks was decided, as pointed out in the majority, the Oklahoma law (§§ 3932 & 3933, Comp.Laws 1909) [1] made it the duty of the State Engineer to make a hydrographic survey and the Attorney General to enter suit for an adjudication of rights. Such duties were still imposed by statute [2] (O.S.1931 §§ 13060 & 13061 respectively) when the

United States Government served notice in 1940 in the present case of their intent to appropriate the waters in question. Then in 1963 the legislature amended the Oklahoma statutes and in 82 O.S.1963 Supp. §§ 11 & 12 stated such hydrographic survey and adjudication "shall not be a condition precedent to securing an appropriation." [3]

Then in 1969 the Oklahoma Supreme Court handed down Oklahoma Water Resources Bd. v. Central Okl. Master Conservancy Dist. mentioned in the majority

---

1. "Sec. 3932. Hydrographic surveys.—The State Engineer shall make hydrographic surveys and investigations of each stream system and source of water supply in the State beginning with those most used for irrigation, obtaining and recording all available data for the determination, development and adjudication of the water supply of the State. He shall be authorized to co-operate with the agencies of the Federal Government engaged in similar surveys and investigations, and in the construction of works for the development and use of the water supply of the State, expending for such purposes any money available for the work of his office, and may accept and use, in connection with the operations of his department, the results of the work of the agencies of the Federal Government."

"Sec. 3933. Adjudication of rights—suit by Attorney-General.—Upon the completion of such hydrographic survey of any stream system, the State Engineer shall deliver a copy thereof together with copies of all data necessary for the determination of all rights to the use of the waters of such system, to the Attorney-General who shall within sixty days thereafter enter suit on behalf of the State for the determination of all rights to the use of such water, and shall diligently prosecute the same to a final adjudication: *Provided,* That if a suit for the adjudication of such rights shall have been begun by private parties, the Attorney-General shall not be required to bring suit; *Provided, However,* That the Attorney-General shall intervene in any suit for the adjudication of rights to the use of water on behalf of the State if notified by the State Engineer that in his opinion the public interest requires such action."

2. "13060. Hydrographic Surveys.

The state engineer shall make hydrographic surveys and investigations of each stream system and source of water supply in the State beginning with those most used for irrigation, obtaining and recording all available data for the determination, development and adjudication of the water supply of the State. He shall be authorized to co-operate with the

agencies of the federal government engaged in similar surveys and investigations, and in the construction of works for the development and use of the water supply of the State, expending for such purposes any money available for the work of his office, and may accept and use, in connection with the operations of his department, the results of the work of the agencies of the federal government."

"13061. Adjudication of Rights—Suit by Attorney General.

Upon the completion of such hydrographic survey of any stream system, the state engineer shall deliver a copy thereof, together with copies of all data necessary for the determination of all rights to the use of the waters of such system, to the attorney general who shall within sixty days thereafter enter suit on behalf of the State for the determination of all rights to the use of such water, and shall diligently prosecute the same to a final adjudication: Provided, that if a suit for the adjudication of such rights shall have been begun by private parties, the attorney general shall not be required to bring suit; Provided, however, that the attorney general shall intervene in any suit for the adjudication of rights to the use of water on behalf of the State if notified by the state engineer that in his opinion the public interest requires such action."

3. 82 O.S.1971 § 11:

". . . Provided, that after the effective date hereof the making of such hydrographic survey shall not be a condition precedent to the granting of permits and licenses to appropriate water as authorized by Chapter 1 of Title 82, Oklahoma Statutes 1961, as now or hereafter amended or supplemented."

82 O.S.1971 § 12:

". . . Provided that after the effective date hereof neither the bringing of such suit nor an adjudication in such a suit shall be a condition precedent to the granting of permits and licenses, as authorized by Chapter 1 of Title 82, Oklahoma Statutes 1961, as now or hereafter amended or supplemented.

opinion, which concerned facts of appropriation prior to the 1963 amendment, although decided after the amendment. In the Supplemental Opinion On Rehearing (464 P.2d 755) Chief Justice Irwin speaking for the court said:

"City also contends the district did not comply with the pre-1963 statutory conditions precedent for the perfection of a water right, i. e., hydrographic survey and adjudication proceedings. We hold said conditions precedent were procedural requirements, which have been eliminated by the 1963 amendments to the pertinent section of Title 82. No one has a vested right in any particular mode of procedure for the enforcement or defense of his rights. Hence the general rule that statutes will be construed to be prospective only does not apply to statutes affecting procedure; but such statutes, unless the contrary intention is clearly expressed or implied, apply to all actions falling within their terms, whether the right of action existed before or accrued after the enactment. Shelby-Downard Asphalt Co. v. Enyart, 67 Okl. 237, 170 P. 708; Fry v. Wolfe, 106 Okl. 289, 234 P. 191."

It therefore seems to me that the validity of an appropriation made prior to the 1963 amendment even, did not depend upon a hydrographic survey being made nor an adjudication being made by reason of *Central*. To this extent *Central* seems to overrule Gay v. Hicks, supra, and indeed, if it does, then appellee's sole ground for contesting appellant Regent's predecessor's appropriation would fail.

I therefore conclude the trial court erred in finding for appellee and concur in the majority's opinion reversing the judgment of the trial court, which grants rights to a stranger, i. e., appellee, which is neither appropriator nor riparian.